UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAREN L. LORD,                  :   **CIVIL NO. 1:07-CV-1229**
                                :
                                :   (Judge Conner)
          Plaintiff            :
     v.                         :   (Magistrate Judge Smyser)
                                :
PENNSYLVANIA NATIONAL           :
MUTUAL CASUALTY INSURANCE       :
COMPANY,                        :
                                :
                                :
          Defendant            :


### REPORT AND RECOMMENDATION


I.  Background and Procedural History.

     The plaintiff, Karen L. Lord, commenced this action
by filing a complaint on July 6, 2007.  The defendant,
Pennsylvania National Mutual Casualty Insurance Company,
is the plaintiff's employer.  The plaintiff alleges that
the defendant pays her substantially less than it pays
male employees who are performing substantially the same
work.  The complaint contains two counts.  Count I is a
claim under the Equal Pay Act, 29 U.S.C. § 206(d).  Count
II is a claim under Pennsylvania's Equal Pay Law, 43 P.S.
§§ 336.1 *et seq.*


     On August 9, 2007, the defendant filed an answer to
the complaint.

Pursuant to the Amended Case Management Order of March 14, 2008, the discovery period ended on April 30, 2008.

On May 23, 2008, the defendant filed a motion for summary judgment, a statement of material facts, a brief and documents in support of its motion.  On June 17, 2008, the plaintiff filed a response to the defendant's statement of material facts, a brief and documents in opposition to the defendant's motion for summary judgment.  On July 7, 2008, the defendant filed a reply brief and additional documents in support of its motion for summary judgment.

This case is on Judge Conner's December 2008 trial list.

II. Summary Judgment Standard.

Summary judgment is appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  With respect to an issue on
which the nonmoving party bears the burden of proof, the
moving party may discharge that burden by "'showing'--
that is, pointing out to the district court -- that there
is an absence of evidence to support the nonmoving
party's case." *Id.* at 325.  Once the moving party has met
its burden, the nonmoving party may not rest upon the
mere allegations or denials of its pleading; rather, the
nonmoving party must "set out specific facts showing a
genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).

A material factual dispute is a dispute as to a
factual issue that will affect the outcome of the trial
under governing law. *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 248 (1986).  "Only disputes over facts that
might affect the outcome of the suit under the governing
law will properly preclude the entry of summary
judgment." *Id.*

Summary judgment will not lie if there is a genuine
dispute about a material fact. *Id.* at 248.  An issue of
fact is "'genuine' only if a reasonable jury, considering
the evidence presented, could find for the non-moving
party." *Childers v. Joseph*, 842 F.2d 689, 693-94 (3d Cir.
1988).  "Where the record taken as a whole could not lead
a rational trier of fact to find for the non-moving
party, there is no 'genuine issue for trial.'" *Matsushita
Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574,

3

587 (1986).  "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Anderson, supra,* 477 U.S. at 249-50.  In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party.  *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson, supra,* 477 U.S. at 249.  The proper inquiry of the court in connection with a motion for summary judgement "is the threshold inquiry of determining whether there is the need for a trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, supra*, 477 U.S. at 322.  "Under such

4

circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002)(quoting *Celotex, supra,* 477 U.S. at 323).

III. Material Facts.

The following facts, presented in the light most favorable to the plaintiff as the non-moving party, are the material facts for purposes of the defendant's motion for summary judgment.

The plaintiff is employed by the defendant. *Doc. 23 at ¶1 and Doc. 28 at ¶1.* The plaintiff's current position is Manager, Workers' Compensation and Managed Care within the defendant's Claims Division. *Id.* The plaintiff has held this position since August of 1999. *Id.*

The plaintiff graduated from high school in 1969. *Doc. 23 at ¶2 and Doc. 28 at ¶2.* She did not attend any college or university after high school. *Id.* Beginning in March of 1970, the plaintiff held a variety of positions (e.g. rater, claims adjuster and claims supervisor) in the insurance industry with several different insurance companies. *Id.* Her focus was

primarily in the area of workers' compensation claims.
*Id.*

The plaintiff began employment with the defendant on
or about March 11, 1991. *Doc. 23 at ¶3 and Doc. 28 at ¶3.*
The plaintiff's initial position with the defendant was
as a Director, Workers' Compensation. *Id.*  The plaintiff
was one of three directors responsible for supervising
analysts handling workers compensation claims defended by
the company. *Doc. 28 at ¶3.*  All three directors had
authority over a geographic region and all three reported
to the Assistant Vice President of Claims. *Id.*  The
plaintiff's initial salary was approximately $48,000.
*Doc. 23 at ¶3 and Doc. 28 at ¶3.*

The defendant uses the Hay Guide Chart Profile Method
of Job Evaluation (Hay System) which results in the
assignment of a specific number of points (Hay Points)
for a position. *Doc. 23 at ¶29 and Doc. 28 at ¶29.*

In 1995, the defendant restructured its workers
compensation line under a single Director of Workers'
Compensation. *Doc. 28 at ¶4.*  The plaintiff applied for
and was appointed as the Director of Workers'
Compensation. *Id.*  She was given responsibility for
directing all workers' compensation claims defended by
the company. *Id.*  The other two former directors became
workers' compensation examiners. *Id.*

6

Tom Kline was hired by the defendant on August 1, 1996. *Doc. 23 at ¶27 and Doc. 28 at ¶27.* His initial position was that of Claims Examiner. *Id.* His starting annual salary was $59,000. *Id.*

In December of 1996, the defendant informed the plaintiff that it was eliminating the title of "Director" and changing her title to Workers' Compensation Line of Business Manager. *Doc. 28 at ¶5.* The defendant advised the plaintiff that this action did not affect the content of her job and would not result in any changes to her compensation. *Id.*

Tom Kline became Director of Technical Operations in September of 1998. *Doc. 23 at ¶27 and Doc. 28 at ¶27.* As Director of Technical Operations, Tom Kline is responsible for multiple lines of business which include his three primary lines - personal auto, commercial auto and general liability - as well as certain specialized lines such as lead paint, homeowners liability, environmental, umbrella liability, subrogation/recovery for all types of claims (including workers' compensation) and bad faith claims. *Doc. 23 at ¶17 and Doc. 28 at ¶17.*

According to the plaintiff, lines of business are artificial distinctions. *Doc. 28 at ¶17.* Both the plaintiff's position and Tom Kline's position are responsible for managing claims against the company. *Id.*

7

Beginning in 1998-1999, the plaintiff became responsible for the managed care aspects of Inservco, a wholly-owned subsidiary of the defendant. *Doc. 23 at ¶6 and Doc. 28 at ¶6.*  Inservco handles workers compensation claims as a third-party administrator for companies which are self-insured for workers' compensation. *Id.*  At approximately this same time frame, the plaintiff's position description was revised to reflect her increased responsibilities relating to Inservco. *Doc. 23 at ¶7 and Doc. 28 at ¶7.*  Her job title became Workers' Compensation and Managed Care Manager. *Id.*  The plaintiff received a $2,641.36 salary increase, resulting in a new salary of $82,661.04. *Id.*  The plaintiff's Hay Points were increased 25 points thereby increasing her salary range midpoint from $75,601.45 to $78,153. *Id.*  Her Hay Points went from 677 to 702. *Id.*

James Butler became Vice President for Claims for the defendant in March of 1999. *Doc. 23 at ¶8 and Doc. 28 at ¶8.*  Beginning in or about 2000, Mr. Butler, the plaintiff's manager, directed harassing behavior toward the plaintiff. *Doc. 28 at ¶8.*  After the plaintiff reported Mr. Butler's harassing behavior, she experienced retaliatory behavior from Mr. Butler including lower annual ratings. *Id.*  Mr. Butler told the plaintiff that he could control the content of her job description and influence her Hay Points. *Id.*

In March of 2002, Mr. Butler rewrote the plaintiff's
job description. *Id.* The Hay points calculated for the
position description as written by Mr. Butler did not
change. *Doc. 23 at ¶9 and Doc. 28 at ¶9.* The plaintiff
disagreed with the content of the job description and
believed that it understated the complexity of her
position. *Doc. 28 at ¶8.* However, the plaintiff signed
the position description as the "jobholder" on March 18,
2002. *Doc. 23 at ¶8 and Doc. 28 at ¶8.*

Mr. Butler resigned from employment with the
defendant in July of 2003. *Doc. 23 at ¶10 and Doc. 28 at
¶10.* He was replaced in September of 2003 as Vice
President of Claims by Ken Garcia. *Id.* Mr. Garcia was
the plaintiff's immediate supervisor. *Id.* Mr. Garcia was
also the supervisor of Tom Kline. *Id.*

Mr. Garcia concluded that the job description for the
plaintiff's position was outdated. *Doc. 28 at ¶28.* On
January 25, 2005, Mr. Garcia sent a memo to Ken Shutts,
the Chief Operating Officer of the defendant, about the
plaintiff's position. *Doc. 28-3, Exhibit 3.* Mr. Garcia
lobbied to have the plaintiff's position titled as a
Director's position rather than as a Manager. *Id.* Mr.
Garcia compares the plaintiff's position with the
position held by Tom Kline as follows:

> What is interesting to note is that the
> responsibilities associated with the Director of
> Casualty (my term as the job description states

"Director - Technical Operations", which is
erroneous) post are not different than what
Karen's position description mandates.
Training, budget management, claims quality,
oversight and supervision of large exposure
claims, settlement and reserve authority
approval, interpretation of trends in severity
and frequency inclusive of data extraction,
analysis and implementation for line performance
improvement, reducing MSS and loss ratio
objectives, etc. are all identical to what Tom
must manage at the Director level.

A major difference between Karen's position
and that of Tom is that Tom only works for the
parent company where Karen must attend to the
needs of PNI and Inservco.  Additionally, Karen
has direct performance responsibility for the
Managed Care Programs for PNI and Inservco where
Tom has responsibility only for PNI's casualty
book.  Karen is required to manage the Hoover
Rehabilitation vendor relationship that is tied
directly to WC interests of PNI and Inservco.
This, in my mind, is a major difference that
supports that fact that Karen's position should
have been at a Director's level long ago.

Another major difference between Tom's post
and that of Karen is the total incurred dollars
managed criteria, which was a measurement
subject matter that Bill suggested be utilized
to distinguish my argument.  In Karen's case she
manages outstanding reserves of $119,973,325 to
Tom's $103,175,657.  Life to Date loss payments
managed for Karen total $235,773,770 to Tom's
$203,833,367 and the Life to Date Incurred
Reserve for Karen totals $355,747,095 to Tom's
$307,009,023.  This is clear evidence that from
a pure financial management exposure component
Karen has the greater responsibility by
$48,738,072.

From a budget management aspect, the
difference in WC compared to casualty is minimal
in that Tom oversees a budget of $647,442 and
Karen's is $418,321 for a difference of
$229,121.  Karen acts as a company liaison
between Hoover and the various insurance
departments whenever the need arises inclusive
of managing directly certain Inservco State
accounts.  Additionally, Karen will be called
upon to attend legislative hearings, review
contracts for proposed vendors both for the
parent company and Inservco, be a participating

10

member of the Inservco new account presentation
team and be the global expert for the WC line of
business.  Again, duties not unlike that of Tom.

When evaluating this position it is
apparent that Karen and Tom have many of the
identical duties and responsibilities.  Karen
manages the greater volume of reserves and
payments and is responsible for multiple
entities where as the Casualty Director's post
is singularly accountable for PNI's casualty
lines of business.  These differences, in and of
themselves, represent sufficient reasoning to
support the contention that Karen's position
should be a Director level post all things being
equal.

Please review the job description that has
been updated for both Karen and Tom. Upon review
you will see the commonalities and differences
all leading to the logical conclusion that Karen
should be a Director as opposed to a Manager.  I
would appreciate your support for this
recommendation and thanks for your time and
consideration.

*Id.*

By a memo dated January 31, 2007, Mr. Garcia again
requested that Mr. Shutts change the plaintiff's position
to that of a Director.  *Doc. 28-3, Exhibit 6.*  In this
memo, Mr. Garcia *inter alia* again compared the
plaintiff's position to the position of Tom Kline:

As I addressed in my presentation dated
January 25, 2006, Karen's position aligns almost
to the tee with that of Tom Kline.  She manages
more reserves and total paid dollars tha[n] Tom
and has duties assigned outside of the technical
management of cases.  There were multiple
distinctions raised in the package of material I
offered that spoke to definitive reasons why her
position is deserving of a Director's title.
Rather than reiterate those differences herein,
I would ask that you review my memo and exhibits
dated January 25, 2006 for the specific details
just to refresh your memory relative to the

11

positions I offered in support of this
recommendation.

*Id.*

Mr. Shutts did not accept Mr. Garcia's recommendation
that the plaintiff's position be a Director's position.
*Doc. 28 at ¶28.*

Mr. Garcia resigned in September of 2007. *Doc. 23 at
¶10 and Doc. 28 at ¶10.*

As Manager, Workers' Compensation and Managed Care
for the defendant, the plaintiff is the technical expert
in workers' compensation and is responsible for managing
the expenses of managed care services throughout the
defendant company, including Tom Kline's lines of
business, and Inservco. *Doc. 23 at ¶11 and Doc. 28 at
¶11.* Managed care includes the application of a fee
schedule to medical (and related prescription drug) bills
for workers' compensation claims, overseeing the medical
management of the claims and numerous other duties
requiring knowledge of a complex base of varying state
laws and regulations that mandate different types of
medical case management as well as vocational case
management. *Doc. 23 at ¶12 and Doc. 28 at ¶12.*

Tom Kline is the technical expert for his multiple
lines of business in such areas as claims' handling
performance, processes and procedures, insurance

coverages, training and state and federal tort law across the various jurisdictions where the company conducts business. *Doc. 23 at ¶24 and Doc. 28 at ¶24.*

Tom Kline is a member of the defendant's Corporate Management Team (CMT). *Doc. 23 at ¶19 and Doc. 28 at ¶19.* The plaintiff is not a member of the CMT. *Doc. 23 at ¶15 and Doc. 28 at ¶15.* However, the CMT is now combined with a group called Monthly Operational Results (MOR). *Doc. 28 at ¶15.* MOR meets monthly and the combined CMT/MOR meetings are held quarterly. *Id.* The plaintiff is involved in the combined meetings the same as Tom Kline. *Id.* Both the plaintiff and Tom Kline receive communication for all meetings and there is no distinction in their involvement. *Id.*

The plaintiff is the immediate supervisor of three direct reports. *Doc. 23 at ¶13 and Doc. 28 at ¶13.* Overall, within the wokers' compensation line of business, the plaintiff has ultimate accountability and responsibility for approximately 35 employees. *Id.* Tom Kline is the immediate supervisor of four direct reports and he has ultimate accountability and responsibility for approximately 108 employees. *Doc. 23 at ¶22 and Doc. 28 at ¶22.*

The plaintiff has claim settlement authority up to $500,000. *Doc. 23 at ¶14 and Doc. 28 at ¶14.* Tom Kline

13

has claim settlement authority up to $1,000,000. *Doc. 23 at ¶18 and Doc. 28 at ¶18.* Settlement authority is a function of job title. *Doc. 28 at ¶18.* If the plaintiff's position were classified as a Director's position she would have the same settlement authority as Tom Kline. *Id.*

As of January 25, 2006, incurred claim reserves managed by Tom Kline totaled $103,175,657 as compared to $119,973,325 incurred claim reserves managed by the plaintiff. *Doc. 28 at ¶13.*

During 2007, 8,603 workers' compensation claims were opened. *Doc. 23 at ¶16 and Doc. 28 at ¶16.* As of December 31, 2007, the defendant held 11,808 workers' compensation policies with total premium values of $97,949,000. *Id.* During 2007, 22,010 claims were opened relating to Tom Kline's multiple lines of business. *Doc. 23 at ¶25 and Doc. 28 at ¶25.* As of December 31, 2007, the defendant held 165,312 policies for such lines of business with total premium values of $263,267,000. *Id.*

The plaintiff is responsible for managing the expenes of managed care services throughout the company, including Tom Kline's lines of business and Inservco. *Doc. 28 at ¶21.* The annual expense to both Penn Nation and Inservco of managed care is in excess of 10 million dollars per year. *Id.*

14

As part of Tom Kline's position, he is responsible for all aspects of litigation management and defense cost containment for the entire Claims Division (including workers' compensation). *Doc. 23 at ¶21 and Doc. 28 at ¶21.* In that regard, he oversees and controls the defendant's approximately $18 million legal and litigation budget. *Id.* This is the third highest company expenditure and is exceeded only by commissions and employee salaries and benefits. *Id.* Tom Kline has the authority to approve fixed fee arrangements with defense counsel as part of his responsibilities relating to litigation management which includes fixed fee arrangements for workers' compensation claims as well. *Doc. 23 at ¶23 and Doc. 28 at ¶23.*

AS of the date that the plaintiff filed this action (July 2007) the plaintiff's annual salary was $103,793.30 and Tom Kline's annual salary was $128,367.67. *Doc. 23 at ¶26 and Doc. 28 at ¶26.*

The essence of both the plaintiff's position and Tom Kline's position is managing claims. *Doc. 28 at ¶13.*

IV. Discussion.

The defendant contends that it is entitled to summary judgment on the plaintiff's Pennsylvania Equal Pay Law claim because Pennsylvania's Equal Pay Law does not cover

15

employees, such as the plaintiff, who are subject to the Fair Labor Standards Act, of which the federal Equal Pay Act is a part.  The plaintiff agrees with this contention. *See Doc. 29 at 10 n.4.*  Therefore, it will be recommended that the defendant be granted summary judgment on the plaintiff's claim under Pennsylvania's Equal Pay Law.

We turn to the plaintiff's Equal Pay Act (EPA) claim. The EPA provides, in pertinent part:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performances of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer which is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).

Claims under the EPA are analyzed under a two-step burden-shifting paradigm. *Stanziale v. Jargowsky,* 200 F.3d 101, 107 (3d Cir. 2000). "The plaintiff must first establish a prima facie case by demonstrating that employees of the opposite sex were paid differently for

16

performing "equal work" - work of substantially equal
skill, effort and responsibility, under similar working
conditions." *Id.*  If the plaintiff establishes a prima
facie case, "[t]he burden of *persuasion* then shifts to
the *employer* to demonstrate the applicability of one of
the four affirmative defenses specified in the Act." *Id.*
(italics in original).  Since the employer bears the
burden of proof at trial with respect to the affirmative
defenses, if the plaintiff establishes a prima facie
case, "in order to prevail at the summary judgment stage,
the employer must prove at least one affirmative defense
'so clearly that no rational jury could find to the
contrary.'" *Id.* (quoting *E.E.O.C. v. Delaware Dept. Of
Health and Social Services,* 865 F.2d 1408, 1414 (3d Cir.
1989)).  In order to be entitled to summary judgment on
the basis of one of the affirmative defenses set forth in
the Act, the employer "must produce sufficient evidence
such that no rational jury could conclude but that the
proffered reasons actually motivated the wage disparity
of which the plaintiff complains." *Id.* at 108.

    The defendant contends that it is entitled to summary
judgment because the plaintiff has not established a
prime facie case in that she has not established that she
and Tom Kline perform equal work.

    "Equal work" under the EPA is work of substantially
equal skill, effort and responsibility performed under

17

similar working conditions.  *Stanziale, supra,* 200 F.3d
at 107.  In determining whether jobs require equal skill,
factors such as experience, training, education and
ability are considered. 29 C.F.R. § 1620.15(a).  "Effort
is concerned with the measurement of the physical and
mental exertion needed for the performance of a job". 29
C.F.R. § 1620.16(a). "Responsibility is concerned with
the degree of accountability required in the performance
of the job, with emphasis on the importance of the job
obligation." 29 C.F.R. § 1620.17(a). "These three terms -
skill, effort, responsibility - 'constitute separate
tests, each of which must be met in order for the equal
pay standard to apply.'" *Welde v. Tetley, Inc.*, 864
F.Supp. 440, 442 (M.D.Pa. 1994)(Mcclure, J.)(quoting 29
C.F.R. § 1620.14(a)).

     "Congress in prescribing 'equal' work did not require
that the jobs be identical, but only that they must be
substantially equal." *Shultz v. Wheaton Glass Co.,* 421
F.2d 259, 265 (3d Cir. 1969).  *See also* 29 C.F.R.
§ 1620.13(a)("The equal work standard does not require
that compared jobs be identical, only that they be
substantially equal.").  Nevertheless, "mere
comparability of positions is not sufficient to give rise
to an inference that the positions under scrutiny are
"equal" as that term is used in the EPA." *Welde*, *supra,*
864 F.Supp. at 442.  "'Failure to furnish equal pay for
'comparable work' or 'like jobs' is not cognizable under

18

the Act.'" *Id.* (quoting *Nulf v. Int'l Paper Co.,* 656 F.2d 553, 560 (10th Cir. 1981)).

"The crucial finding on the equal work issue is whether the jobs to be compared have a "common core" of tasks, *i.e.,* whether a significant portion of the two jobs is identical." *Brobst v. Columbus Services International,* 761 F.2d 148, 156 (3d Cir. 1985). If the plaintiff establishes a "common core" of tasks, "[t]he inquiry then turns to whether the differing or additional tasks make the work substantially different." *Id.* Whether two job classifications entail equal work must be decided on a case by case basis. *Id.* "Given the fact intensive nature of the inquiry, summary judgment will often be inappropriate." *Id.*

Considering the evidence in the light most favorable to the plaintiff, and particularly given Mr. Garcia's memos, we conclude that the plaintiff has presented evidence from which a reasonable finder of fact could conclude that her position and the position of Tom Kline have a common core of tasks - managing claims. Nevertheless, we still conclude that given the additional duties of the two positions the plaintiff has not established a prima facie case under the EPA.

In addition to managing claims, the plaintiff is responsible for managing the expenses of managed care

19

services throughout the company and Inservco.  The annual expense to both Penn Nation and Inservco of managed care is in excess of 10 million dollars per year.  In addition to managing claims, Tom Kline is responsible for all aspects of litigation management and defense cost containment for the entire Claims Division and he oversees and controls the defendant's approximately $18 million legal and litigation budget.

Managed care and litigation are distinct areas that require distinct skills and that entail distinct responsibilities.  Although there is no doubt that both areas are important to the defendant's business, the plaintiff has not presented evidence from which a reasonable finder of fact could conclude that the plaintiff's managed care duties and Tom Kline's litigation management duties require equal skill, effort and responsibility.  Accordingly, the plaintiff has failed to establish a prima facie case under the EPA. Therefore, it will be recommended that the defendant be granted summary judgment on the plaintiff's EPA claim.[1]

---

[1] Given our conclusion that the plaintiff has failed to establish a prima facie case under the EPA, we need not address the defendant's contention that it is entitled to summary judgment for the additional reason that the salary differential between the plaintiff and Tom Kline is based on a factor other than sex, i.e. the Hay Point System.

V. Recommendations.

Based on the foregoing, it is recommended that the defendant's motion (doc. 22) for summary judgment be granted, that summary judgment be entered in favor of the defendant and that the case file be closed.


_____     ***/s/ J. Andrew Smyser***
                                    J. Andrew Smyser
                                    Magistrate Judge

Dated:  August 19, 2008.